UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

TALONZO DEBROW                    CIVIL ACTION NO. 05-CV-0940-P

versus                           JUDGE HICKS

WARDEN BURL CAIN                  MAGISTRATE JUDGE HORNSBY

## REPORT AND RECOMMENDATION

### Introduction

A Caddo Parish jury convicted Talonzo Debrow ("Petitioner") of second degree murder. Petitioner pursued a direct appeal with the sole assignment of error that the evidence was insufficient to support the verdict. State v. Debrow, 810 So.2d 197 (La. App. 2d Cir. 2002), writ denied, 840 So.2d 535 (La. 2003). Petitioner applied for post-conviction relief and raised five additional claims, which were denied. He then filed this action seeking federal habeas relief on the same five grounds he used in his application for post-conviction relief. It is recommended, for the reasons that follow, that the petition be denied.

### Background Facts

The facts set forth in the state appellate court's decision on direct appeal provide a background for the claims discussed below. That court wrote that, on the night of June 6, 1999, Petitioner and some companions crashed a private party at a hall on Exposition Street in Shreveport, Louisiana. The party was planned by and for some employees of Horseshoe Casino. Problems immediately ensued when Petitioner and his companions attempted to take

liquor from the party as it was ending. The liquor was returned after a confrontation with Shaquita Mosely, one of the party planners.

Petitioner, who was seen at the party wearing a red striped shirt, was heard saying that if he did not get the liquor, then he would get or "jack" somebody. Soon thereafter, Petitioner approached Carl Gilliam, who was sitting in his automobile in a parking lot. A gunshot was heard. Gilliam exited his car and fell to the ground as Petitioner was seen jogging away. More shots were fired as Steve Brown and others approached to help Gilliam. Brown was hit by a bullet. Brown and Gilliam were taken to Louisiana State University Medical Center. Gilliam died as a result of his injuries from the gunshot. Brown recovered.

Petitioner was arrested for the murder. Two searches led to the recovery of a red striped shirt and a .25 caliber handgun. Petitioner gave two statements to the police. In the first statement, he admitted wearing a red striped shirt the night of the murder, taking liquor from the party then returning it when confronted, planning with his companions to rob someone at the party, and approaching Gilliam's car with his companion Peter Shine to commit robbery. Petitioner claimed not to have had a gun on him. He stated that his companion, Peter Shine, was the triggerman. In the second statement, Petitioner indicated that he did have a .25 caliber gun in his possession during the course of the evening, but that Peter Shine gave him the gun to hold and that he gave it back to Shine just before they approached Gilliam. Petitioner was brought to trial before a jury, found guilty of second degree murder, and sentenced to life imprisonment.

**Batson Claim**

### A. Introduction

Petitioner's first claim is that the trial court erred by allowing the State to systematically exclude African-Americans during voir dire in violation of <u>Batson v. Kentucky</u>, 106 S.Ct. 1712 (1986). The following framework governs the evaluation of <u>Batson</u> claims: "(1) the petitioner must make a prima facie showing that the prosecutor exercised his peremptory strikes on the basis of race; (2) the burden of production then shifts to the prosecutor to articulate a race-neutral reason for challenging the venire member; and (3) finally, the trial court must decide whether the petitioner has sustained his burden of proving purposeful discrimination." <u>Soria v. Johnson</u>, 207 F.3d 232, 237 (5th Cir 2000).

During voir dire, defense counsel objected to the State's peremptory exclusion of three African-American jurors: Ms. Winston, Ms. Bourgeois, and Ms. Sanders. (Vol. 3, p. 494). The State responded by noting that two African-Americans, Mr. Graham and Ms. Fuller, remained as prospective jurors. (Vol. 3, pp. 495-496). The State also argued that it had race-neutral reasons for excluding the three jurors it had challenged but that it did not have to state those reasons unless the court found a prima facie exclusion based on race. (Vol. 3, p. 495). Noting that Mr. Graham and Ms. Fuller had not been excluded, the trial court ruled that Petitioner did not make a prima facie showing of purposeful discrimination. (Vol. 3, p. 496). Defense counsel indicated his intention to apply for an emergency writ on the matter (Vol. 3, p. 497), but the record does not indicate that any such writ application was filed.

## B. Post-Conviction Proceedings

There is a potential procedural bar defense to the <u>Batson</u> claim, based on the proceedings set forth below, but the procedural bar need not be addressed in light of the recommended denial of the claim on the merits. The procedural history is nonetheless recited here to note the state courts' rulings on a related <u>Strickland</u> claim and for the benefit of any reviewing court that may wish to rest its decision on the procedural bar issue.

On direct appeal, Petitioner did not make or brief an assignment of error on his <u>Batson</u> claim. (Vol. 5, pp. 828-838). Petitioner then applied for post-conviction relief. In its November 6, 2003 Opinion, the district court found that Petitioner failed to preserve the <u>Batson</u> issue on appeal and therefore defaulted the claim on state procedural grounds. (Vol. 6, p. 912). The court gave Petitioner thirty days to explain his failure to include this claim in his appeal. (Vol. 6, p. 915).

Petitioner then filed a writ to the appellate court. (Vol. 6, pp. 916-919). He also filed a Motion of Clarification on November 24, 2003, stating that he failed to assert his <u>Batson</u> claim on appeal due to ineffective assistance of counsel. (Vol. 6, pp. 924-978). This specific claim was also part of a larger claim for ineffective assistance of counsel that was asserted as the fifth ground in Petitioner's application of post-conviction relief and has been reasserted in this action (Vol. 6, pp. 871 and 880-886). The larger ineffective assistance of counsel claim had already been rejected by the district court in its November 6, 2003 Opinion on the basis of the two-prong test found in <u>Strickland v. Washington</u>, 104 S.Ct. 2052 (1984).

On December 18, 2003, the state appellate court ruled as follows:

The trial court was correct in finding that the applicant has presented claims that he failed to raise in his appeal. The trial court has properly complied with the provisions of La. C. Cr. P. art. 930.4 F and ordered the applicant to provide his reasons for failing to include them previously. However, the trial court's order denying the claims is somewhat misleading and this court herein finds that the matter should be remanded. The trial court is to re-issue a ruling on these claims after either the applicant states his reasons as requested or, in default thereof, after the time period for such response has lapsed.

(Vol. 6, p. 980). The appellate court also upheld the district court's rejection of Petitioner's ineffective assistance of counsel claim. (Vol. 6, p. 980).

Petitioner then filed in the district court a Motion for Evidentiary Hearing, in which he reasserted the claim he made in his Motion for Clarification that his counsel was ineffective for failing to preserve the <u>Batson</u> issue on appeal. (Vol. 6, pp. 981-983). On March 26, 2004, the district court denied Petitioner's Motion for Clarification, finding once again that Petitioner was not denied effective assistance of counsel under the <u>Strickland</u> test. The ruling set forth the applicable law and, with no analysis, stated that Petitioner had not satisfied the performance or prejudice requirements of <u>Strickland</u>. (Vol. 6, pp. 1006-1007). Petitioner then filed a writ application with the appellate court. That court denied the application without prejudice for failure of Petitioner to include proper documentation. (Vol. 6, p.1027). Finally, on October 20, 2004, the district court denied Petitioner's Motion for Evidentiary Hearing. The district court also ruled that Petitioner failed to state, within the thirty days provided in the November 6, 2003 Opinion, the reasons why the <u>Batson</u> claim was not asserted in his appeal (Vol. 6, p. 1107). In the meantime, Petitioner had been pursuing

relief in the Supreme Court of Louisiana. That court denied a writ application without comment. (Vol. 6, p.1109). There were other steps in the procedural history, but this recitation suffices to demonstrate the nature of the proceeding.

The State contends that Petitioner's claim is now procedurally barred pursuant to Coleman v. Thompson, 111 S.Ct. 2546, 2554 (1991) because the State court's judgment rests upon State procedural requirements. This court will not decide the procedural default issue due to the complexity of the procedural history of this case and does not need to do so because Petitioner's Batson claim fails on the merits. See Glover v. Hargett, 56 F.3d 682, 684 n.1 (5th Cir. 1995)(the court may decline to address whether a claim is procedurally barred when the claim fails on the merits).

### C. Section 2254 Standard of Review

As discussed above, the trial court found that Petitioner did not make a prima facie showing of purposeful discrimination, despite the exclusion of three African-Americans, because two African-Americans remained as prospective jurors. The trial court's decision that a prima facie showing was not made is properly reviewed under 28 U.S.C. § 2254(d). That statute provides that a federal court may not grant habeas relief with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."

To the extent a factual finding is challenged, Petitioner must show that the state-court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2). For an inquiry under subpart (d)(1) or (2), the state court's factual determinations are "presumed to be correct". § 2254(e)(1). That presumption can be rebutted only by "clear and convincing evidence." § 2254(e)(1). Henderson v. Quarterman, ___ F.3d ___, 2006 WL 2329494 (5th Cir. 2006).

The "contrary to" clause of 28 U.S.C. § 2254(d)(1) is inapplicable in this case because the trial court correctly identified the governing legal principles outlined by the Supreme Court in Batson. Under the "unreasonable application" clause, a federal court may grant habeas relief if the State court has identified the correct governing legal principle from the Supreme Court's decisions but unreasonably applied that principle to the facts of Petitioner's case. Williams v. Taylor, 120 S.Ct. 1495, 1523 (2000). Even if the federal court, in its independent judgment, has a firm conviction that the State court was incorrect in its application of a federal constitutional principle, this alone does not permit the federal court to grant habeas relief. Relief is not permitted unless the State court decision was so wrong as to be objectively unreasonable. Lockyer v. Andrade, 123 S.Ct. 1166, 1175 (2003).

**D. Analysis of Merits**

The trial court was correct in ruling that the burden of providing race-neutral reasons for the exclusion of potential jurors does not shift to the State unless Petitioner makes a prima facie showing of purposeful discrimination. Soria, supra. Thus, the only issue that must be

decided is whether the trial court's determination that Petitioner did not make a prima facie showing of purposeful discrimination is objectively unreasonable.

The Supreme Court has determined that in order to make such a prima facie showing, "the defendant first must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race.  Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate.  Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." Batson, 106 S.Ct.  at 1723 (citations and internal quotation marks omitted).

The trial court's application of the above principles in this case was reasonable.  It is undisputed that Petitioner is African-American and that the State excluded three potential African-American jurors.  However, the trial court properly considered the totality of the circumstances, including the fact that two African-Americans were not excluded from the jury. According to Batson:

> "In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances.  For example, a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose."

Batson, 106 S.Ct. at 1723. The Court explained that those examples are merely illustrative. And it emphasized: "We have confidence that trial judges, experienced in supervising voir dire, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors." Batson, 106 S.Ct. at 1723.

Judge Leon Emanuel, III, an experienced African-American trial judge, presided at trial and was in the best position to consider all the relevant circumstances in determining whether the (white) prosecutor's actions raised an inference of race-based exclusion. This court is also aware that Caddo Parish prosecutors are assigned to a "section" presided over by a particular judge, a process which typically ensures that a prosecutor works primarily with one judge and that the judge becomes quite familiar with the practices and personality of the prosecutor assigned to his section. Judge Emanuel was likely very familiar with the prosecutor in this case, Jason Waltman, which provides a basis to afford additional deference to Judge Emanuel's largely factual determination that there was no prima facie showing of purposeful discrimination. It is also noteworthy that Mr. Graham and Ms. Fuller, the two African-American potential jurors who were referenced during argument on the Batson objection were not excluded and ultimately served on the jury. (Vol. 4, p. 568). This tends to indicate that Petitioner's equal protection rights were not violated and that the jury that convicted him was fair. Because the trial court's considered application of Batson to the facts

of this case, based on his personal observation of the voir dire, cannot be said to be so incorrect as to be objectively unreasonable, the conviction may not be vacated on this ground.

**Inadmissible Evidence**

### A. Introduction

Petitioner's second claim is that the trial court erred in allowing the state to introduce the red striped shirt and the .25 caliber pistol. He argues that the shirt was the result of an illegal search of his mother's house that was conducted without her consent. He contends the pistol came from another source but was irrelevant because it was inoperable.

Petitioner did not raise this claim on direct appeal. When he asserted it in his post-conviction application, the district court denied it on the procedural grounds that Petitioner inexcusably omitted the issue from his direct appeal. The appellate court stated that the trial court was correct in that finding. (Vol. 6, pp. 912 & 980). The claim then pursued the rather complicated procedural path outlined above with respect to the <u>Batson</u> claim. Once again, the court will forego a procedural bar analysis and address the merits.

### B. Illegal Search

Corporal James Sorrells of the Shreveport Police Department testified that he assisted in the execution of a *search warrant* at 2815 Frederick and, during the search, personally located a red striped shirt and a pair of red pants. He found the shirt in the washing machine and bagged them as evidence. (Vol. 4, pp. 725-28).

Detective Donna Lott testified that she also participated in the execution of the *search warrant* at 2815 Frederick, where Petitioner and his mother lived, as well as a warrant for 2933 Catherine Street. She identified pieces to a .25 caliber handgun that was recovered during the search of the Catherine Street address. She testified that the pieces were broken apart in a similar fashion when they were recovered. (Vol. 4, pp. 728-30). Also, the State appellate court noted in its statement of the facts that the execution of "two search warrants" led to the recovery of the shirt and gun parts. Debrow, 810 So.2d at 1198.

Petitioner makes a conclusory assertion that police never obtained a search warrant for his mother's home, but he points to no facts in the record that are contrary to the two officers' sworn testimony that the search was conducted pursuant to a warrant. That is reason enough for the Fourth Amendment claim to fail. Furthermore, a federal habeas court is generally barred from reviewing Fourth Amendment claims if the state has provided a process whereby a defendant can obtain full and fair litigation of Fourth Amendment issues. Stone v. Powell, 96 S.Ct. 3037 (1976); Janecka v. Cockrell, 301 F.3d 316, 320 (5th Cir. 2002). Louisiana provides a mechanism to file a motion to suppress, so the Fourth Amendment claim is also subject to this defense.

### C. Relevance

Dr. Cogswell, who performed the autopsy of the victim, testified that the fatal bullet was approximately a .25 caliber. (Vol. 4, p. 646). Richard Beighley, a firearms expert with the area crime lab, testified that he had examined the seized .25 caliber pistol and determined

that the weapon was not capable of being fired in its current condition because it was "missing some of the major components in order for that weapon to fire." Beighley was nonetheless able to examine the interior of the barrel of the weapon and "able to physically eliminate it as having fired th[e] bullet" that killed the victim. (Vol. 4, pp. 721-23). The police report indicates that the parts were seized from the Catherine Street address during the execution of a search warrant and an arrest warrant for suspect Kenderick Samuels. (Vol. 1, pp. 81-82).

Petitioner argues that the pistol parts are irrelevant because there was no evidence they were part of the murder weapon. Federal courts do not grant habeas relief based on mere errors in the application of State evidentiary rules or even consider it relevant whether State evidentiary rules were satisfied. Only federal constitutional errors that satisfy the demanding standards of Section 2254 merit habeas relief. The Due Process Clause provides a mechanism for relief when a State court wrongfully admits evidence, but only if the evidence is so unduly prejudicial that it renders the trial fundamentally unfair. The sole inquiry is whether the admission violated the Constitution. Bigby v. Cockrell, 340 F.3d 259, 271-72 (5th Cir. 2003), citing Dawson v. Delaware, 112 S. Ct. 1093 (1992) and Estelle v. McGuire, 112 S.Ct. 475 (1991). If constitutional error is found, a petitioner's claim will still fail absent a showing that the evidence had a substantial and injurious effect or influence in determining the jury's verdict. Bigby, 340 F.3d at 272. Of course, for this court to order relief, it must

find that the State court performed an objectively unreasonable application of those principles.

The State has not articulated a reason the gun parts were relevant, so an objection to their admission may have been sustained by the trial judge. Evidence discussed below will show that Petitioner gave a statement in which he said that Peter Shine fired the fatal shot and then fled with the murder weapon to Kenderick Samuels' house, which is where the gun parts were found. The impossibility that the gun found there fired the fatal shot tends to undermine Petitioner's version of the events. In any event, there is no reason to believe that the admission of the gun parts, assuming it was erroneous, was so prejudicial as to render the trial fundamentally unfair and have a substantial effect or influence on the verdict. It appears that the parts were introduced, an expert testified that the barrel could not have fired the fatal shot, and there was no further emphasis on the gun parts as any indication of Petitioner's guilt. Under these circumstances, there is no prejudice sufficient to vacate the conviction under Section 2254.

**Coercion**

Petitioner's third claim is that the trial court erred by failing to suppress allegedly coerced statements made by Petitioner. Petitioner points to testimony from Detective Lott in which she admitted that police overstated the strength of the evidence they had gathered against Petitioner in order to persuade him to confess. Petitioner also claims that, during his

interrogation, the police told him that if he cooperated he would not be charged and could go home.

Police reports show that Petitioner was first interviewed after his arrest. Petitioner waived his <u>Miranda</u> rights and gave a statement in which he admitted that he was wearing a striped shirt at the party and that he was the person who argued with one of the party hosts about the alcohol. Petitioner said that his group decided that they were going to rob people at the party, and he and Peter Shine approached Gilliam in his car to "jack" him. Petitioner said Shine had the weapon and shot Gilliam after Gilliam refused to comply with an order to drop his keys. Petitioner says he and one of his fellow gang members went to a house in the Lakeside area, and the last time he saw the other criminals was when they entered Kenderick Samuels' residence. (Vol. 1, pp. 79-80).

Petitioner gave a second interview two days later and changed his story. He said that Peter Shine had given him a chrome .25 pistol to "hold" before they went to the party. Petitioner said that as he and Shine approached the victim's car, he gave the gun back to Shine, who shot the victim, returned the pistol to Petitioner, and began to run. Petitioner said that, as they ran, Shine took the pistol back and went to Kenderick Samuels' residence. (Vol. 1, p. 83).

A hearing was held outside the presence of the jury to determine whether Petitioner's statements were free and voluntary. A single witness, Detective Lott, testified. She said Petitioner was not threatened, promised anything for his statement, or given any inducements

for his statement. Petitioner then gave his first statement. Detective Lott offered similar testimony that the second statement, taken two days later, was not the result of threats, promises or offers of anything in exchange for the statement.

Defense counsel asked Lott if police told Petitioner anything that was not true as far as what witnesses had said about his involvement in the crime. Lott responded, "not to my knowledge." Lott later admitted that she did tell Petitioner that there were Polaroid photographs taken at the party, but "I don't have them." Lott denied that she or her partner told Petitioner they had found the gun used in the crime. She also admitted that it was not accurate to tell Petitioner that "everybody" at the party had identified Petitioner as the shooter because Lott could name only two men, Peter Shine and Rickey Moore, who did so. Lott admitted that officers had not told Petitioner of potential weaknesses in the evidence, such as one witness saying that a person at the car at the time of the shooting had a "QB" tattoo on his arm when Petitioner did not, and that some witnesses had identified "fillers" in photo lineups. Lott admitted the officers did not have any fingerprints of Petitioner, but counsel suggested the police had implied they did. The following exchange then occurred:

> Q. Do you still deny using untrue statements to obtain this statement from Mr. Debrow?
>
> A. In what respect?
>
> Q. In any respect.
>
> A. Well, you have to be more specific than that.
>
> Q. Did you lie to Mr. Debrow in order to get him to say anything?

A.     There may have been statements that weren't exactly true, but as far as, you know, you would have to be more specific.

Q.     You lied to him?

A.     I can't say that he wasn't lied to, no I can't say that he was not.

Q.     Okay. All right.

A.     It is not against the law to do that.

Q.     I'm sorry?

A.     It is not against the law to do that.

(Vol. 4, pp. 583-84)

The trial judge who heard the evidence made a finding that "the statement given by the defendant was freely and voluntarily and intelligently given after he knowingly waived his Fifth Amendment rights." (Vol. 4, pp. 572-87). Detective Lott testified at trial, and similar questioning was pursued. (Vol. 4, pp. 728-57). The tape recordings of both statements were played at the hearing and during trial, but the court reporter did not transcribe the recordings for the written record, and the recordings were not presented to this court.

There are two issues of voluntariness that often arise in connection with statements made during a custodial interrogation. First, a statement or confession must be voluntary to be admissible, and a judge must make a determination of voluntariness before the confession is admitted to the jury. <u>Jackson v. Denno</u>, 84 S.Ct. 1774 (1964). Second, a suspect has a right, recognized by <u>Miranda</u>, to be informed of his right to remain silent when faced with

custodial interrogation, but the suspect may waive that privilege if the waiver is made voluntarily, knowingly and intelligently.  Miranda v. Arizona, 86 S.Ct. 1602, 1612 (1966). A finding of a voluntary and valid Miranda waiver is usually tantamount to a conclusion that the resulting confession or statement was also voluntary. Missouri v. Siebert, 124 S.Ct. 2601, 2608 (2004).

Evidence that an accused was threatened, tricked or cajoled into a waiver may show that the accused did not voluntarily waive his privilege against self-incrimination.  Such trickery or deceit "is only prohibited to the extent it deprives the suspect 'of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them'." Soffar v. Cockrell, 300 F.3d 588, 596 (5th Cir. 2002) (en banc).  There is no evidence or suggestion that the officers employed any trickery or deceit to obtain from Petitioner a waiver of his Miranda rights.  Petitioner claims only that, *after* he waived his rights, officers (1) promised that he would be released if he cooperated and (2) overstated the strength of the evidence against him.  There is not a scintilla of evidence in the record to support the assertion that officers promised to release Petitioner if he cooperated.  As for the embellishment of the strength of the case, that appears to be a common police tactic that has not been held by the Supreme Court to invalidate a confession.  The trial judge heard all the evidence, including the tactics employed by the police, and found the statement to be voluntary.  That finding is not an unreasonable determination of the facts in light of the evidence presented and is not contrary to or an unreasonable application of clearly

established Supreme Court precedent  Accordingly, relief is not available on this claim under Section 2254(d).  <u>See</u> "Custodial Interrogations," 34 Georgetown Law Journal Annual Review of Criminal Procedure 158, n. 592, 593 & 594 (2005) (collecting federal appellate cases that have found confessions voluntary despite investigators' false claims of evidence against the accused and other deceptive police tactics).

**Defective Indictment**

Petitioner's fourth claim is that the indictment (Vol. 1, p. 7) is fatally defective for failing to give adequate notice of the nature and cause of the second degree murder charge. The indictment cites the relevant statute, La. R.S. 14:30.1, for second degree murder and charges that Petitioner, on or about June 6, 1999, "committed the second degree murder of Carl Gilliam."  That is in perfect compliance with the indictment form rule found at La. C. Cr. P. art. 465(A)(32). The district court found that the post-conviction challenge to the instrument was waived because Petitioner failed to file a Motion to Quash the Indictment, and the court also found that the indictment was valid under Article 465. The appellate court rejected the claim because Petitioner failed to offer a copy of the indictment with his writ application or argument as to how it was defective.  (Vol. 6, p. 913, 980).

The sufficiency of a state indictment is not a matter for federal habeas corpus relief unless it can be shown that the charging instrument "is so defective that the convicting court had no jurisdiction." <u>Morlett v. Lynaugh</u>, 851 F.2d 1521, 1523 (5th Cir. 1988); <u>Dowell v. C.M. Lensing</u>, 805 F.Supp. 1335, 1342-43 (M.D. La. 1992).  For a charging instrument to

be fatally defective, no circumstances can exist under which a valid conviction could result from facts provable under the instrument. State law is the reference for determining sufficiency and if the issue "is presented to the highest state court of appeals, then consideration of the question is foreclosed in federal habeas corpus proceedings." Morlett, supra. See also McKay v. Collins, 12 F.3d 66, 68-69 (5th Cir. 1994).

Petitioner presented his complaints about the charging instrument to the state courts. The trial court, the last State court to pass on the merits of the claim, found that the instrument was in compliance with state law. No relief is available on this claim. The claim may also be susceptible to a procedural bar defense, but that defense need not be addressed in light of the lack of underlying merit.

**Ineffective Assistance of Counsel**

Petitioner's fifth claim is that he was denied effective assistance of counsel both at trial and on appeal. The State courts rejected the claims with little discussion. Petitioner bears the burden of proving two components, deficient performance and prejudice, to establish ineffective assistance of counsel. Counsel's trial performance was deficient only if he made errors so serious that, when reviewed under an objective standard of reasonable professional assistance and afforded a presumption of competency, he was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland v. Washington, 104 S.Ct. 2052, 2064 (1984). Prejudice exists only if there is a reasonable probability that, but for the

error, the result of the trial would have been different. A reasonable probability is one sufficient to undermine confidence in the outcome. Id. at 2068.

The standard is similar for claims of ineffective appellate counsel. Persons convicted of a crime are entitled to effective assistance of counsel on their first appeal of right. Evitts v. Lucey, 105 S.Ct. 830 (1985). Counsel's performance on appeal is judged under the Strickland test. Counsel is not obligated to raise every non-frivolous ground of appeal available. He need only perform in a reasonably effective manner. Green v. Johnson, 160 F.3d 1029, 1043 (5th Cir. 1998) (citing Evitts). When a petitioner claims that counsel omitted an issue that should have been argued, the petitioner must show that had the issue been raised there was a reasonable probability that he would have won on appeal. Smith v. Robbins, 120 S.Ct. 746, 764 (2000); Moreno v. Dretke, 450 F.3d 158, 168 (5th Cir. 2006).

Petitioner claims that counsel should have objected to the introduction of the shirt and pistol parts. Petitioner's arguments about the admissibility of those items, discussed above, were based on both the Fourth Amendment and relevance. "Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." Kimmelman v. Morrison, 106 S.Ct. 2574, 2583 (1986). As explained above, the record reflects that there were warrants to search the homes where the shirt and gun were found, and

there is no rational basis in the record for counsel to have filed a motion to suppress. As for relevance of the pistol parts, the State has not offered a basis for their relevance, but the State did no more than introduce the parts, explained that they were taken from another suspect's house, and have the firearms expert testify that it was impossible for the barrel of that weapon to have fired the fatal shot. Under those circumstances, there is no prejudice sufficient to vacate the conviction stemming from the admission of the parts.

Petitioner argues that counsel should have objected to the alleged deficiencies in the indictment. It was explained above that the indictment is in compliance with Louisiana law, as the State courts found. Failure of counsel to raise meritless objections is not ineffective assistance. Clark v. Collins, 19 F.3d 959, 966 (5th Cir. 1994). For the same reasons, appellate counsel's omission of this and the other meritless issues just discussed did not result in prejudice because there is not a reasonable probability that counsel would have won on appeal had he raised these issues.

Petitioner claims that appellate counsel should have raised the Batson issue and challenged his statements as involuntary. The Batson claim was reviewed in detail above. Although a state appellate court would not have reviewed the appellate claim under the demanding Section 2254(d) standard required of this court, the undersigned believes that the capable trial judge's assessment of the Batson issue would have nonetheless withstood scrutiny so that there is not a reasonable probability the defense would have won on appeal had this issue been raised. With respect to the voluntariness of Petitioner's statements, the

review of that issue above shows that there is neither a factual nor legal basis for such a claim.

Petitioner claims the trial counsel wrongfully conceded his guilt during closing argument. Counsel did not, however, concede guilt to any crime that was at issue in the trial. He argued forcefully that Petitioner may have been present the night of the murder but did not shoot the victim. Relevant portions of his argument follow:

> Now, ladies and gentlemen, what Talonzo did that night was wrong. There is no denying that. He shouldn't have been there with those guys. He shouldn't have had that gun for Peter Shine. He shouldn't have been doing any of that. And holding a gun for a two time convicted felon is wrong. And it is easy to see why Peter Shine wouldn't want to have that gun. Why? He is a two time looser. He is a two time convicted felon.
>
> * * * *
>
> Holding the gun for him is not the same thing as shooting him. Holding the gun is not evidence that Talonzo shot Carl Gilliam. He shouldn't have been there, and **what he did was wrong, and he should be punished** but he did not commit the murder of Carl Gilliam. He did not commit the manslaughter of Carl Gilliam. And there is no evidence that he did. No credible, believable evidence that he did.

(Vol. 5, pp. 785-86). Petitioner focuses on the emphasized language as a concession of guilt, but when the statement is put in its proper context, it is plain that counsel was speaking in the generic sense when he said that Petitioner did something wrong, and Petitioner himself admitted that he was involved in the crime. The argument was neither deficient performance nor did it prejudice the verdict.

Petitioner offers a brief argument that counsel failed to cross-examine Dr. Cogswell in regard to the position of the shooter when the weapon was fired. Petitioner's only elaboration of this claim is: "Had counsel investigated the case, then it would have been discovered that the petitioner never set foot inside of the victim's car." Dr. Cogswell testified that the entrance wound was on the left side of the lower chest about a foot down from the top of the victim's shoulder and about six inches to the left of the bottom of his breastbone. The bullet traveled through the bottom part of the left lung and then continued on to lacerate the spleen, stomach and aorta, the largest blood vessel in the body, where it ran along the victim's spine. The bullet then struck the renal vein that drains blood from the right kidney. (Vol. 4, pp. 643-47). Dr. Cogswell did not offer any specific testimony regarding the position of the shooter when the weapon was fired, although the site of the entrance wound and path of the bullet would imply that the shooter was firing down at the victim. Petitioner's complaint that counsel could somehow have discovered that Petitioner was never inside the victim's car is a bare, conclusory assertion backed by no specific facts. Petitioner admitted in his second statement that he and Shine both approached the car and that he gave the gun to Shine when they were only eight feet from the car. This argument provides no basis for habeas relief.

Petitioner's final argument is that counsel erred in not interviewing two potential witnesses, Marlon Shine and Kenderick Samuels, in regards to Petitioner's condition after he consumed alcohol and used cocaine. Petitioner says such testimony could have been used

to counter the state's accusation of specific intent and improve the chances of a lesser manslaughter conviction. Peter Shine did tell police that Petitioner was "high on powder" when he saw him at the party with a gun out. (Vol. 1, pp. 86-87). Samuels told police that Petitioner was "acting drunk or high" when he was at the party. (Vol. 1, pp. 103-04). The fact of an intoxicated or drugged condition at the time a crime is committed is immaterial except when (1) the condition is involuntary and is the direct cause of the crime or (2) the condition has "precluded the presence of a specific criminal intent or of special knowledge required in a particular crime." La.R.S. 14:15. This is an affirmative defense that the defendant has the burden of proving by a preponderance of the evidence. State v. Edwards, 790 So.2d 109, 114 (La. App. 5th Cir. 2001).

Petitioner was charged with second degree murder, which is the killing of a human being when the offender has a specific intent to kill or inflict great bodily harm. La.R.S. 14:30.1. A second degree murder may also be committed if the offender is engaged in the perpetration or attempted perpetration of certain enumerated felonies, "even though he has no intent to kill or to inflict great bodily harm." Id. The trial judge instructed the jury on both of these theories, including that Petitioner killed the victim while he was engaged in the perpetration or attempted perpetration of armed robbery, first degree robbery or simple robbery even though he had no intent to kill or inflict great bodily harm. (Vol. 5, p. 800).

Counsel might have attempted the intoxication defense, but it would not have avoided a conviction under the "no intent" prong of second degree murder. Furthermore, calling

Shine and Samuels as witnesses would have been risky. Shine told police that he saw Petitioner standing at the driver's side window of the victim's car just prior to the shooting, and Samuels said that Petitioner had a gun and was boasting that he would demonstrate that he was not a "whore cause my brothers are in jail" if they would watch, just moments before the shooting. Considering these legal and factual circumstances, counsel was not ineffective for failing to press the intoxication defense by calling those two witnesses.

Accordingly,

**IT IS RECOMMENDED** that the petition for writ of habeas corpus be **denied** and that Petitioner's complaint be **dismissed with prejudice**.

THUS DONE AND SIGNED at Shreveport, Louisiana, this 14th day of September, 2006.

MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE
